FILED
HARRISBURG, PA

JUN - 7 2012

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO.** |
| | : | |
| **GEISINGER HEALTH SYSTEM** | : | *4:CV-12-1081* |
| **FOUNDATION, BLOOMSBURG** | : | |
| **HEALTH SYSTEM and BLOOMSBURG** | : | |
| **HOSPITAL,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## COMPLAINT

The Commonwealth of Pennsylvania, through its Office of Attorney

General, brings this action under the federal and state antitrust laws alleging the

proposed acquisition of Bloomsburg Hospital and certain other entities of the

Bloomsburg Health System ("BHS") by Geisinger Health System Foundation

("GHSF") is unlawful.

## I. **Jurisdiction and Venue**

1.      This Court has jurisdiction over this action pursuant to 15 U.S.C.

§§ 15 and 26 and 28 U.S.C. §§ 1331 and 1337.

2.      Defendants are found and transact business within this district and the

claims in substantial part arise in this district.  Venue is proper in the Middle

District of Pennsylvania under sections 12 and 16 of the Clayton Act, 15 U.S.C.

§§ 22 and 26 and under 28 U.S.C. §§ 1391(b) and (c).

3.      The Plaintiff also brings this action pursuant to its pendent state

antitrust claims under the Pennsylvania common law doctrine against suppression

of competition.  Under its state claims, the Plaintiff seeks permanent injunctive

relief.

4.      This Court has jurisdiction over the state law claims pursuant to 28

U.S.C. § 1367 (a).  The causes of action set forth in this Complaint under both the

federal and state antitrust laws derive from a common set of operative facts that

raise substantially identical factual issues.

## II. **Parties**

5.      The Plaintiff is the Commonwealth of Pennsylvania, represented by

its Attorney General, Linda L. Kelly.  Attorney General Kelly is the chief law

enforcement officer of the Commonwealth of Pennsylvania and is authorized by

the Commonwealth Attorneys Act to bring actions on behalf of the Commonwealth

and its citizens for violations of the antitrust laws pursuant to 71 P.S. § 732-204

(c).  The Commonwealth of Pennsylvania brings this action as *parens patriae* to

protect its general economy and as a direct purchaser of hospital services from

defendants through its Medicaid and Pennsylvania Employee Benefits Trust Fund

programs.

6.     Geisinger Health System Foundation ("GHSF") means the non-profit,

tax-exempt corporation based in Danville, Pennsylvania, which is the parent

corporation of Geisinger Medical Center, Geisinger Clinic, Geisinger Health Plan

and other Health-Care Providers and related healthcare companies in central and

northeastern Pennsylvania.

7.     Bloomsburg Health System ("BHS") means the non-profit, tax-

exempt corporation based in Bloomsburg, Pennsylvania, which owns and controls

Bloomsburg Hospital, Bloomsburg Physicians Services, Bloomsburg Health Care

Center, Columbia/Montour Home Health Services/VNA and Bloomsburg Hospital

Medical Professional Liability Self-Insurance Trust.

8.     Bloomsburg Hospital ("BH") is non-profit hospital organized under

the laws of the Commonwealth of Pennsylvania with its principal address at 549

East Fair Street, Bloomsburg, PA 17815.  BH is licensed for 72 beds.  Geisinger-

Bloomsburg Hospital ("G-BH") refers to BH after Closing.

## III. **Definitions**

9.      "Acquire" means to purchase the whole or the majority of the assets, stock, equity, capital or other interest of a corporation or other business entity or to receive the right or ability to designate or otherwise control the majority of directors or trustees of a corporation or other business entity.

10.      "Acquired Party" or "Acquired Parties" means Bloomsburg Health System, Bloomsburg Hospital, Bloomsburg Physician Services, Bloomsburg Health Care Center, Columbia/Montour Home Health Services/VNA and Bloomsburg Hospital Medical Professional Liability Self-Insurance Trust.

11.      "Berwick Hospital" ("Berwick") means the for-profit hospital owned and operated by Community Health Systems, Inc., having its principal address at 701 East 16th Street, Berwick, PA  18603.  Berwick is licensed for 101 beds.

12.      "BH Payor Contract" means a contract between BH and a Health Plan for the furnishing of inpatient and/or outpatient health care services at BH to Health Plan members, and is in effect.  A BH Payor Contract includes contracts for Commercial, Medicare Advantage and Medicaid Managed Care products, unless specified otherwise.

13.      ""Bloomsburg Physician Services" ("BPS") is a multi-specialty physician group practice with approximately 25 primary care and specialty physicians.  BPS is a non-profit, tax- exempt corporation with its principal address

4

at 549 East Fair Street, Bloomsburg, PA 17815.  BPS shall refer to this entity

pre-merger and will be merged into the Geisinger Clinic following Closing.

14.    "Closing" means the satisfaction of all conditions and occurrence of

all events necessary to transfer control of the Acquired Parties to GHSF.

15.    "Community Health Systems" ("CHS") is a for-profit corporation

which operates general acute care hospitals throughout the United States, including

several in Pennsylvania, most notably, the Berwick Hospital, BH's and GMC's

only competitor in Columbia County.  CHS has its principal address at 4000

Meridian Boulevard, Franklin, TN  37067.

16.    "Geisinger Clinic" ("GC") is a multi-specialty physician group

practice with more than 900 primary care and specialty physicians.  GC is a non-

profit, tax-exempt corporation with its principal address at 100 North Academy

Avenue, Danville, PA 17822, and includes employed physicians who provide

healthcare service at various physician offices located in central and northeastern

Pennsylvania for primary and specialty care.

17.    "Geisinger Health Plan" ("GHP") is a health plan licensed by the

Pennsylvania Insurance Department.  GHP is a non-profit, tax-exempt corporation

with its principal address at 100 North Academy Avenue, Danville, PA 17822.

GHP provides insurance coverage in 43 counties in Pennsylvania.

18.   "Geisinger Medical Center" ("GMC") is a non-profit hospital organized under the laws of the Commonwealth of Pennsylvania with its principal address at 100 North Academy Avenue, Danville, PA 17822.  GMC is licensed for 485 beds and provides a comprehensive array of highly-specialized medical and surgical services, including neurosciences, cardiovascular services, transplantation, women's health, pediatrics and oncology.

19.   "Geisinger-Shamokin Area Community Hospital" ("G-SACH") is a non-profit hospital organized under the laws of the Commonwealth of Pennsylvania with its principal address at 4200 Hospital Road, Coal Township, PA 17866.  G-SACH is licensed for 55 beds and provides primary and secondary care hospital services and is located in Northumberland County.

20.   "Geographic Market" means Columbia County.

21.   "Health-Care Provider" means hospitals, laboratories, physicians, physician networks and other health care professionals.

22.   "Health Plan" means any type of organized health-service purchasing or third-party payment program, including, but not limited to, health insurance and managed-care plans, whether offered by government, for-profit or non-profit, third-party payors, Health-Care Providers or any other entity, including Commercial, Medicare Advantage and Medicaid Managed Care Health Plan contracts for inpatient and outpatient hospital services.

23.    "Hospital" means a health care facility, licensed as an acute care hospital, having a duly organized governing body with overall administrative and professional responsibility and an organized professional staff that provides 24-hour inpatient care, that may also provide outpatient services, and that has as a primary function the provision of inpatient services for medical diagnosis, treatment and care of physically injured or sick persons with short-term or episodic health problems or infirmities.

24.    "Inpatient Acute Care" and "Acute Care" includes room and board, medical or surgical diagnostic and treatment services, around-the-clock monitoring and observation, nursing care, laboratory, x-ray and support services for physically injured or sick persons with short-term or episodic health problems or infirmities.

25.    "Medicare Advantage Plans" means a health plan option approved by Medicare and run by private Health Plans.  These plans are part of the Medicare Program in which Medicare pays an amount for members' care each month to private Health Plans and private Health Plans must follow rules set by Medicare. The plans cover members' Part A (Hospital Insurance) and Part B (Medical Insurance) benefits and must cover all of the medically-necessary services that the Original Medicare Plan provides.  The plans may offer extra benefits, such as vision, hearing, dental and/or health and wellness programs.  The plans generally have provider networks, which mean members probably have to see doctors who

belong to the plans or go to certain hospitals to get covered services.  If members use doctors or hospitals that are not in the Health Plans' networks, they may have to pay the entire cost of the covered services or pay a higher cost for these out-of-network provider covered services.

26.    "PPO Rental Network" means a Health Plan that sells or rents its contracted network of providers to other entities including other Health Plans.

## IV. <u>Trade and Commerce</u>

27.    According to data published by the Pennsylvania Health Care Cost Containment Council, total net patient revenues of BH in 2010 were more than $39 million and total operating expenses exceeded $40 million.  Total net patient revenues of GMC in 2010 were more than $751 million and total operating expenses were more than $718 million.  GHSF and BHS are engaged in interstate commerce and their activities are in the flow of, and substantially affect, interstate commerce.

28.    The provision of Inpatient Acute Care occurs, at least in part, through various channels of interstate communication and transportation.

## V. <u>The Merger</u>

29.    BHS is a non-profit, tax-exempt Health-Care Provider based in Bloomsburg, Pennsylvania, which is located in Columbia County.  BH is the

largest entity in BHS. Its largest competitors are GMC, located in adjacent Montour County, and Berwick, which is also located in Columbia County. Other hospitals outside the relevant geographic market provide negligible competition to BH for the provision of primary and secondary Acute Care services and of those, GHSF's owned G-SACH, located in neighboring Northumberland County, is the largest provider.

30.     Pursuant to an agreement dated September 15, 2011, GHSF and BHS seek to transfer ownership of BHS through GHSF's acquisition of BHS.

31.     While GMC is not located in Columbia County, it is the largest provider of primary and secondary Inpatient Acute Care Services to residents of Columbia County, generally, and to Health Plans, in particular. GMC is located ten miles from Bloomsburg Hospital and less than five miles from the Columbia County border.

32.     Berwick is BH's only other significant competitor for the provision of primary and secondary Inpatient Acute Care services in the relevant geographic market. There are no other Hospitals within the relevant geographic market.

33.     In addition to GMC, GHSF owns G-SACH, which it acquired on January 1, 2012. According to GHSF, G-SACH is the preferred destination for those who leave BH's primary and secondary service areas for care.

34.     GMC and BH both employ physicians in Columbia County.

35.     BHS has been struggling financially for years. It has suffered losses for the last three consecutive years due, in part, to a patient base that slightly exceeds 50% combined Medicare and Medicaid recipients.

36.     In January 2011, BHS determined it had five strategic options: (1) Sell or merge the physician practices to a third party and continue to operate the health system; (2) Sell the entire system to CHS; (3) Sell it to another for-profit; (4) Sell or merge with GHSF; or (5) Sell or partner with another non-profit. Ultimately, BHS's Board of Directors determined that BHS was most likely to survive if it sought a merger partner and realized that its continued losses would make it impossible for BHS to survive on its own.

37.     Early in 2011, it became clear to BHS after numerous conversations with potential purchasers, that there were two entities interested in acquiring BHS: 1) GHSF and 2) CHS.

38.     The BHS Board of Directors evaluated each potential purchaser.

39.     GHSF and CHS both made presentations to the BHS Board.

40.     On April 14, 2011, the BHS Board of Directors, based on the information available to it at that time, voted to enter into a Confidentiality Agreement with GHSF to explore a purchase.

41.     On April 18, 2011, BHS entered into a Confidentiality Agreement with GHSF to explore the feasibility for combining their operations. The

10

Agreement provided for exclusive dealing and could be terminated by either party at any time within 15 days of the notice.

42.    On April 20, 2011, the CEO of BHS received an unsolicited written contemplated proposal from CHS.

43.    The BHS Board of Directors authorized BHS to sign a Letter of Intent with GHSF on June 15, 2011.

44.    On September 15, 2011, BHS signed a Comprehensive Integration and Merger Agreement with GHSF.

45.    The Pennsylvania Office of Attorney General learned of the CHS proposal through an unrelated transaction.

46.    It was only after the Attorney General's staff inquired about this proposal that a copy was distributed to the BHS's own Board of Directors at a Board meeting on January 26, 2012.

47.    Given BHS's dire financial condition and the CEO's assertions that only GHSF, and not CHS, could fill beds at BH, the BHS Board chose to continue with the GHSF transaction, fearing the facility would otherwise close.

## VI. Relevant Geographic Market

48.    The relevant geographic market is an area that includes Columbia County.  According to data published by the Pennsylvania Healthcare Cost Containment Council, for the first three quarters of 2011, GMC accounted for 46%

of the total cases in the market; BH accounted for 22% of the total cases in the market; and Berwick accounted for 22% of the total cases in the market.

49.     The appropriate geographic market is determined by examining the geographic boundaries within which a hypothetical monopolist for the services at issue could profitably raise prices by a small but significant amount.

50.     Bloomsburg residents have a clear preference for obtaining hospital care and physician services locally.

51.     GHSF defines BHS's geographic service area as Columbia County. GMC and GHSF have a far larger geographic service area due to the size of its network and services.  The only geographic area where GHSF may profitably raise prices through the acquisition of BHS by a small but significant amount as a result of this transaction is Columbia County.

52.     In the event of a significant price increase, Health Plans cannot turn to hospitals outside this relevant geographic market, other than GMC and G-SACH, as substitutes and continue to market a product in Columbia County.

53.     Pre-acquisition, a Health Plan could offer primary and secondary Inpatient Acute-Care Hospital services by having GMC, BH or Berwick in its network and offer a product in the relevant geographic market.  Post-merger, if GMC and Bloomsburg, which would be part of the Geisinger Health System, refused to contract with a health plan, a health plan would be limited to offering a

product with only Berwick in the network.  Hospitals located outside this relevant geographic market are not viewed as substitutes of GHSF and BH for primary and secondary Inpatient Acute Care services.

54.    GMC and BH compete for the provision of primary and secondary Inpatient Acute-Care Hospital services in Columbia County.  They do not compete in the provision of tertiary or higher level Inpatient Acute-Care Hospital services because these are not provided at BH.

55.    Medicare Advantage Plans serving or seeking to serve Columbia County cannot use hospitals outside Columbia County to constrain prices at GMC post-merger.  The Centers for Medicare and Medicaid Services ("CMS") require that a potential plan have sufficient access to primary and secondary Inpatient Acute-Care Hospital services, tertiary Inpatient Acute Care services and primary specialist and tertiary specialist physician services, among other services, to potential Medicare Advantage Plan members within a county.

56.    GMC refuses to accept any Medicare Advantage Plan other than its owned Geisinger Gold product.  This would force any Medicare recipient residing in Columbia County post-merger to choose Geisinger Gold or travel outside the area.  GHSF's acquisition of BHS means that Medicare Advantage recipients will only have Berwick as an option in the Geographic Market.  Medicare Advantage Plans serve consumers receiving Medicare, most of whom are ages 65 and older.

57.   As Medicare Advantage Plans serve older consumers, those consumers have less physical ability to travel and often have less income to pay for travel costs than other consumers.

58.   Medicare Advantage Plans cannot use hospitals or primary care and non-tertiary specialist physicians outside this geographic market to constrain prices at GMC and BH post-merger.

## VII.  Relevant Product Market – Primary and Secondary Inpatient Acute Care Hospital Services

59.   GMC and BH sell primary and secondary Inpatient Acute-Care Hospital services to a variety of purchasers, including Health Plans such as HMOs, PPOs and Medicare Advantage Plans.  Health Plans and Medicare Advantage Plans reduce healthcare costs by encouraging hospitals to compete vigorously on price and quality.  These plans contract with a select number of hospitals and employ financial incentives to encourage plan enrollees to use the contracted facilities.

60.   Through competition for the provision of Hospital services to their Health Plan, these price-sensitive health-care purchasers secure Hospital services at competitive rates, which constrain the overall cost of Hospital care.  This, in turn, permits Health Plans to offer health insurance to consumers at lower prices.

Health Plans constitute a significant percentage of GMC's and BHS's revenues from patient care.

61.     The availability or non-availability of key healthcare facilities, such as Hospitals, has a significant effect on the viability of a Health Plan.  Access to certain hospitals is an important factor for employers choosing a Health Plan. Within the relevant geographic market, some Health Plans do not have access to GMC and are only able to cover primary and secondary Inpatient Acute Care services because those are provided at BH and Berwick.

62.     If this merger proceeds, those Health Plans, which do not have a contract with GMC, may also be unable to contract with BH.

63.     Losing access to BH will further weaken Health Plans that have been able to only secure a small percent of the Health Plan Market.  Access to key healthcare facilities is of similar importance to price.

64.     Patients whose treatment or condition requires an overnight hospital stay, however, cannot be safely or effectively treated on an outpatient basis. Additionally, primary and secondary Inpatient Acute-Care Hospital services cannot be offered in an outpatient facility due to the complex nature of this level of care. For these reasons, health-care purchasers, including Health Plans, do not view outpatient services as substitutes for primary and secondary Inpatient Acute-Care Hospital services.  Primary and secondary Inpatient Acute-Care Hospitals could

profitably increase the price of their services without causing a significant number of health-care purchasers to switch to outpatient services.

65.     The provision of Inpatient Acute Care services sold to Health Plans constitutes a line of commerce, or a relevant product market, within the meaning of section 7 of the Clayton Act.  15 U.S.C. § 18.

## VIII.  Relevant Product Market – Primary and Non-Tertiary Specialty Physician Services

66.     GC operates physician practices throughout its 31-county service area in Pennsylvania, including several in Columbia County.  These physician practices compete with BH-owned physicians and independent physicians in solo or small group practices in Columbia County who have privileges at BH.

67.     BH employs primary and non-tertiary specialty physicians because it offers primary and secondary Inpatient Acute-Care Hospital services.

68.     GMC is a "closed staff" model Hospital meaning that only physicians employed by GC have staff privileges at GMC.

69.     GHSF's acquisition of BHS, along with its BHS-owned physicians, eliminates competition between those primary and non-tertiary specialty physicians.

70.    If GMC were to apply the closed staff model to BH after its acquisition, it could eliminate competition from independent physicians who currently have privileges at BH.

71.    Similarly, Health Plans and consumers rely on competition between independent physicians, BHS physicians and physicians employed by GC serving Columbia County residents to obtain the best combination of price and quality for primary and non-tertiary specialist physician services.

72.    BHS and GHSF both employ and control physicians in Columbia County.

73.    There are no substitutes for the provision of primary and non-tertiary specialty physician services.

74.    The acquisition of BH's physicians by GHSF will lessen competition and tend to create a monopoly and is illegal.

75.    The provision of primary and non-tertiary specialist physician services constitutes a line of commerce or relevant product market.

## IX. **Market Concentration**

76.    The market is highly concentrated by any measure of Hospital capacity or output.  Market concentration would increase substantially as a result of the proposed combination of BHS and GHSF.  The combined entity would control 85% of the market for primary and secondary Inpatient Acute Care services

(based on licensed beds).  GMC is the largest Inpatient Acute Care Services hospital in the market, followed by BHS and Berwick.

77.    Currently, the pre- and post-acquisition Hospital market shares for primary and secondary Inpatient Acute-Care Hospital services in the relevant geographic market, based on the percentage of total cases reported to the Pennsylvania Health Care Cost Containment Council for the first through third quarters of 2011, are as follows:

| Hospital | Market Share % |
|----------|----------------|
| GMC | 46% |
| BHS | 22% |
| Berwick | 22% |
| Total: | 90% |

78.    The proposed merger increases concentration significantly in the primary and secondary Inpatient Acute-Care Hospital services market in the relevant geographic market.

79.    The provision of primary and secondary Inpatient Acute-Care Hospital services is distinct from the provision of services by other types of health care facilities, such as clinics, ambulatory surgery centers, physician's offices, nursing homes or rehabilitation or psychiatric hospitals.

80.     There are no substitutes for primary and secondary Inpatient Acute Care.

81.     In the foreseeable future, no new primary and secondary Inpatient Acute-Care Hospital is likely to enter the relevant geographic market.

82.     As new entry appears unlikely, the acquisition of BHS by GHSF will lessen competition and tend to create a monopoly and is illegal.

## X. **Anticompetitive Effects**

83.     The acquisition of BHS by GHSF will end decades of significant competition between BH and GMC and will increase GHSF's ability and incentive to demand higher reimbursement rates from Health Plans.

84.     GHSF will have the ability to raise prices at BH once it acquires BHS.

85.     Fully-insured employers and their employees pay premiums, co-pays and deductibles in exchange for access to a health plan's provider network and for insurance against the cost of future care.  The costs to employers and health plans members are inextricably linked to the reimbursement rates that health plans negotiate with each health care provider in their provider network.

86.     Self-insured employers have access to their Health Plan's network at reimbursement rates negotiated by their Health Plan but assume all risk for the costs of care provided to their employees.  Self-insured employers must pay the entirety of their employees' health care claims, less employee contributions such as

co-pays and deductibles and, as a result, they immediately and fully incur any hospital rate increases. The effect on self-insured employers of any price increases is that they, along with their employees, will bear 100% of any increase in rates at BH to GMC rates.

87.   GHSF will only accept its own Medicare Advantage product at all of its facilities, including physician services and any ancillary services, such as laboratory work.

88.   Many seniors who do not have GHP have turned to BHS for these services.

89.   Those seniors will be forced to travel to Berwick, or if a service is unavailable there, a greater distance if GHSF acquires BHS.

## XI. Count 1

### Violation of Federal Antitrust Laws

90.   As a direct result of the violation of the Federal Antitrust Laws, competition for primary and secondary Inpatient Acute-Care Hospital services and primary and non-tertiary specialist physician services in the relevant geographic market may be substantially lessened in the following ways, among others:

>      A.   Existing competition and the potential for increased
>           competition between BH and GMC for the provision of
>           primary and secondary Inpatient Acute-Care Hospital services

and primary and non-tertiary specialist physician services in the
relevant geographic market will be substantially reduced;

B.  Concentration in the relevant product markets in Columbia
County will be substantially increased;

C.  The likelihood of collusion in the relevant geographic market in
Columbia County may be substantially increased; and

D.  Increased concentration in Columbia County may enhance the
ability of the merged entities to increase prices and decrease
quality of service with little fear that such price increases and
decreases in quality of service will be defeated by existing
fringe competitors or new market entrants.

91.  The proposed acquisition violates section 7 of the Clayton Act, 15
U.S.C. § 18.

## XII.  Count 2

### Violation of State Common Law Doctrine Against Suppression of Competition

92.  Plaintiff repeats each and every preceding allegation as if fully set
forth herein.

93.  The effect of the acquisition of BHS by GHSF would be to suppress
or lessen competition substantially for the provision of primary and secondary

Inpatient Acute- Care Hospital services and primary and non-tertiary specialist physician services in Columbia County, Pennsylvania, in violation of the Pennsylvania common law doctrine against the suppression of competition.

94.     This acquisition threatens loss or damage to the general welfare and economy of the Plaintiff and to the citizens of the Commonwealth of Pennsylvania. The Plaintiff and its citizens will be subject to a continuing and substantial threat of irreparable injury to the general welfare, economy and competition in the Commonwealth of Pennsylvania unless the Defendant is enjoined from finalizing the acquisition.

95.     The acquisition would likely have the following effects, among others:

A.     Competition in the provision of primary and secondary Inpatient Acute-Care Hospital services and primary and non-tertiary specialist physician services in the relevant geographic market would be eliminated or substantially lessened;

B.     Actual and future competition between GHSF and other competitors for the provision of primary and secondary Inpatient Acute-Care Hospital services and primary and non-tertiary specialist physician services would be eliminated or substantially lessened;

C.  Prices for the provision of primary and secondary Inpatient Acute-Care Hospital services and primary and non-tertiary specialist physician services would likely increase to levels above those prior to the acquisition;

D.  Innovation and quality of the provision of primary and secondary Inpatient Acute-Care Hospital services and primary and secondary non-tertiary specialist physician services would likely decrease, if not disappear, below levels existing prior to the acquisition;

E.  Depriving customers of the benefits of fair competition for primary and secondary Inpatient Acute-Care Hospital services and primary and non-tertiary specialist physician services in Columbia County, Pennsylvania;

F.  Enhancing GHSF's own interests at the expense of the citizens of the Commonwealth; and

G.  Interfering with the interests of the public.

## XIII. Injury

96.  Unless the violations described above are enjoined, the Commonwealth of Pennsylvania will suffer direct, immediate and irreparable

damage to its general economy and as a direct purchaser of Inpatient Acute-Care Hospital services and primary and non-tertiary specialist physician services.

## XIV.  Relief Requested

WHEREFORE, plaintiff prays:

(a)    That the proposed acquisition of BHS by GHSF be adjudged to be in violation of section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)    That the proposed acquisition of BHS by GHSF be adjudged to be in violation of the Pennsylvania common law doctrine against the suppression of competition;

(c)    That defendants, their parents, subsidiaries, affiliates, directors, officers, agents, successors and assigns and all others acting on their behalf, be preliminarily and permanently enjoined from taking any action directly or indirectly to consummate the proposed acquisition of BHS by GHSF;

(d)    That defendants be ordered to pay plaintiff's costs and attorneys' fees; and

(e)    That the Court grant such other relief as it deems appropriate.

Dated: June 7, 2012          Respectfully submitted,

Linda Kelly
Attorney General

24

By:  _____
James A. Donahue, III
Chief Deputy Attorney General
Antitrust Section
Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-4530
(717) 705-7110 (fax)
jdonahue@attorneygeneral.gov
PA: 42624

_____
Jennifer A. Thomson
Deputy Attorney General
Antitrust Section
Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-4530
(717) 705-7110 (fax)
jthomson@attorneygeneral.gov.
PA: 89360

_____
Tracy W. Wertz
Senior Deputy Attorney General
Antitrust Section
Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-4530
(717) 705-7110 (fax)
twertz@attorneygeneral.gov.
PA: 69164

Attorneys for the Commonwealth
of Pennsylvania

JAT/lkl/complaint1124

25